Good morning, your honors. My name is Michael Perlis, and I'm here on behalf of Federal Insurance Company. I would also like to reserve five minutes, and we'll keep your honors' admonition to mind the clock. I'd like to start by really describing what this case is not about before I get to what it is about. It is not about whether there was a fraud at FTM. There was. It is not about whether someone deserved to go to prison. He did. Mr. Miller was sentenced for his fraud. It is not about whether FTM was a profitable corporation. It was not. It lost money. What this case is about is whether under this crime policy, FTM, or Pacific Enterprises in this case, had the ability and was able to prove the kind of direct loss that Judge Collins determined had to be proved in order to tap into the limits of that insurance policy. And we suggest that they failed, and they failed for a number of reasons. The first issue I'd like to address is the expert testimony. Pacific Enterprises was faced with a problem, and that problem was a result of the fact that virtually everyone who had taken a look at what had occurred at FTM prior to the inception of litigation and dispute with Federal Insurance Company had come to the conclusion that the credit scheme had basically gone back into FTM and was used in a losing business. That was the conclusion of the report of the Special Committee of Pacific Enterprises formed to investigate FTM that was assisted by Ms. Bocek, the head of internal audit, by a major accounting firm, by the law firm of Skadden Arps. And that report was specifically tasked to examine whether there was a misappropriation of assets and concluded, with certain minor exceptions, it appeared not, and went on to its – But 1.8 million or so of that went to the gentleman's name, I reckon. Miller. Miller. Yeah. That's correct, 1.8 million, but one million of that was an authorized repayment of debt, which even Mr. Freeman testified appeared to have been authorized by the board, but nevertheless was awarded as damages to Pacific Enterprises. The issue here is not whether or not Pacific Enterprises might not, with a different expert and a different theory, been able to prove something. The question is whether or not they should have been permitted to use these experts and these theories to prove anything. In any event, if it was 1.8 million with a half a million dollar retention, the amount of the award would have been 1.3 million or less if you assume the 1 million was authorized, Your Honor. Was there a remittiture filed in this case? There was a motion for a new trial which was denied. No remittance? No. All right. The Director of Internal Audit, Ms. Bocek, testified at her deposition that the money path was circular, although later she may have changed her testimony, but she was repeatedly examined on that. The experts hired by Federal Insurance during the initial focus of the claims process, Campos and Stratos, concluded that the money was circular. So Pacific Enterprises was faced with a rather daunting task, and they hired Mr. Martens and Mr. Freeman to come up with a theory. And their first theory was that there was a loss of approximately $48 million that was compensable by the carriers, and that opinion was rejected on Daubert grounds by Judge Collins and is not the subject of any appeal. Judge Collins did give them, in the face of a motion for summary judgment, an opportunity to supplement the expert opinion and to demonstrate, for example, what portion of this loss was attributable to operating expenses, because those would not be chargeable to Federal Insurance. Mr. Martens and Mr. Martens alone prepared that supplemental declaration, and he described the work as being his work with some of his associates, and he indicated what he had looked at before. Mr. Freeman was not a co-author of that opinion. The Court allowed Mr. Martens to be deposed. He was. And his methodology was largely invalidated through the course of cross-examination, so much so that when the motion for summary judgment was considered by Judge Collins, she granted it. And in granting it, she faulted the methodology of Mr. Martens, who had used supposed gross profit margins that were not based on reality but had been pulled from thin air, had eliminated inventory, which Pacific Enterprises had conceded was on the books. And she had said, basically, that in her function as gatekeeper under Daubert, that this particular expert's report was not sufficiently credible to go to a jury, and she granted summary judgment. She rejected it. Finding her role as gatekeeper precluded jury consideration of the Martens report. Her decision was appealed. This Court reversed, but on grounds different than her ruling with respect to the Martens report. It came back, and there was a motion in limine to exclude Martens. The Court … What grounds was it reversed on? It was reversed on the ground that there was at least sufficient evidence to demonstrate that the loss was in excess of $500,000, which was the minimum deductible required. And it was specifically based upon Judge Collins' determination not to allow a finding made in a sentencing hearing in a criminal case as to a loss to Pacific Enterprises. In other words, the money the villain ever paid back could have exceeded that threshold. Right. It had nothing to do with the definition of direct loss as required by the policy. And in fact, in the order on the motion in limine, Pacific Enterprises had raised the question of whether or not Judge Collins was precluded from ruling on the admissibility or utilization of the Martens report based upon the law of the case, and she said no, no. The Court of Appeals did not rule on this issue, and I think that was correct, and that has not been appealed by Pacific Enterprises. But this time, while finding the same deficiencies with the Martens report that she'd found earlier, which precluded her in her role as gatekeeper from allowing the report to be presented to the jury at all, she determined that she would allow it to be presented to the jury, finding it deficient the same as she had before, and allowing for vigorous cross-examination. And the reason that she allowed it was because he had tried to comply with her order, even though he hadn't, which was the same argument that had been made previously and been rejected by Judge Collins, so that we have a judge saying as gatekeeper, I will not allow this opinion in because it is so deficient it can't be presented to a jury. We have the same opinion with the same finding as to its deficiencies, but now allowed to be presented to the jury. Counsel, what case authority do you rely upon to say that that was a reversible error for the court to allow the opinion that she had previously found deficient? What's your strongest case? Well, I mean, I think Daubert and Kumho are clearly cases that say where an expert's opinion is sufficiently unreliable, and in this case, Judge Collins found it to be unreliable. The district court must act as gatekeeper to exclude that from evidence. Now, there may be other circumstances where there is a modicum of reliability, where vigorous cross-examination may suffice, but the case law that addresses the question of whether or not where an opinion loses all connection to the facts, which Judge Collins found, and is simply unreliable, the Nebraska Plastics Eighth Circuit case is one example. Counsel, can I make sure I understand your argument? You're saying she was right the first time, and in fact, she was right the second time, but she didn't follow her own decision. That's correct. In other words, that she concluded that she didn't change her basic determination that the opinion was unreliable, but she just allowed it to go to the jury. That is correct, and I think that was an abuse of discretion, particularly in light of her conclusion that the opinion was so unreliable, and in fact, her quote is, it was so unreliable that as a gatekeeper under Daubert, I can't let it go to the jury. I think she is entitled to change her mind. I mean, if I can just follow up on Judge Rollinson's question. Well, I mean, she can change her mind. If there are so many rulings, she can change her mind. But she didn't. In other words, she didn't say on reflection, I found it a little more reliable. What she did was found the same thing she found the first time, except applied a different remedy without explanation. Moreover, I would think, even if she had changed her mind, it would still be an abuse of discretion for her to have done so under Cumho and under Daubert, because it was an opinion wholly disconnected from the fact. But it gets worse, and it gets worse in this context. When the time comes for trial, Mr. Freeman, who has been an expert for Pacific Enterprises, is designated as the testimonial expert. There's no surprise here. Mr. Martens has been discredited in cross-examination, as has his theory. We objected. The objection was overruled. We asked for Mr. Freeman's deposition. That was denied. The judge did advise, however, that she was going to require Mr. Freeman to adhere to the report provided by Mr. Martens. She didn't. And she didn't in material respects. Mr. Freeman got up on the witness stand and testified basically as to two separate opinions, one of which utilized a number that Mr. Martens had previously utilized on the bottom line, which was a loss of 31-435-367. But the way he got to it was by taking that 31 and then working the numbers backwards so that they always didn't coincide either with Mr. Martens' numbers or reality. And let me give you a prime example of that. If you look at the exhibit, which is in the Pacific Enterprises excerpt of Record Volume 2 at tab 35, you will see that in the opinion provided on the paper, butcher paper, Mr. Freeman has a calculation, which is keyed with damage analysis, of expenses of $28 million and change. Mr. Martens' number was about 56 million. Then he does the profit margin at 30 percent, which was, again, disconnected from reality. And if you took those two numbers and added them up, you should have the revenue for FTM. Those two numbers added up were $39 million. The agreed upon revenue for FTM during this period was $35 million, not $39 million. So, again, we have a disconnect from the facts. Inventory that was on the books was simply excluded from consideration. In terms of trying to figure out operating expenses, he subtracted the profit margin at 30 percent from these altered expenses, which is nowhere recognized in accounting literature as being any kind of realistic approach to this type of calculation. And then he reached the same bottom line number Mr. Martens did. When that is presented in the context of a jury trial in the first instance, you can imagine the disadvantage of cross-examining counsel in trying to address this new type of testimony. Second, he then presented a wholly new number using a gross profit margin of 9.66 percent, which had never been used by anybody before in any expert report, but in fact was an accurate number. And then used that number to assault the expert for Pacific Enterprises by saying he couldn't even calculate the real number and come up with a different conclusion using the same infirm numbers to reach his $23 million number, which is a number the jury accepted minus a certain deduction, to reach a result. If this testimony had been excluded, there would have been no proof of loss that Pacific Enterprises had put forward and the matter would have. May I ask you, if the correct profit margin was used ultimately, why is that an error? Why is there a reversible error? Because while if the correct profit margin was used ultimately, the still, the method of calculation was wrong because of the elimination of inventory, because of the methodology in which he used to get to there, which in essence implied sales higher than the sales reflected on the books and records of Pacific Enterprises. So the, because the inventory was backed out by the jury, correct? The inventory was backed out by their experts. Part of it was put back by the jury. All right. But at least some inventory was backed out and you agree that the 9.66 number is correct. Correct. So it's the number to which the 9.66 is applied that's wrong? That is correct. Okay. But is that why the district judge originally excluded the report? I thought she excluded the expert's report because of the 30% figure or the profit margin figure rather than what you're now complaining about. No, the district court, Your Honor, excluded the report, which was also presented to the jury incidentally at 30% for a variety of reasons. Among them were the 30% profit margin. In her latest report, in the second, after remand, when she explains why she excluded it, she says that in rejecting the methodology, the court explained it was premised on wholly unreliable assumptions regarding FTM's margin of profit. What she said, though, Your Honor, was the inadequacy of Marten's methodology are numerous. And the most glaring one is the 30%, but there were others as well. What were they? Among other things, the elimination of inventory. Well, but that was rectified. A failure to include as operating expenses other items that we suggested should have been included, which I will discuss next. Those were among other things that I think convinced the trial judge to exclude it completely. But notwithstanding that fact, she still allowed the 30% to be presented to the jury as Mr. Freeman's principal number. The only case that Pacific Enterprises relies on, Your Honor, is Hurley. And Hurley really stands for a proposition that it is possible that a witness can come up with something different if there's adequate notice. In this case, they were given the report substantially before trial. They had a month after the testimony to prepare for rebuttal. This is testimony that was sprung on us, notwithstanding contrary representations by the trial judge at trial. And it's not only the question of 9.66 versus 30. It is a question of the math which was deliberately reconstrued from the Marten's report on how to get there. It's one thing if you've looked at a particular Marten's report and seen the methodology, and then for someone else to then come up and apply an entirely different methodology using different numbers that result in different scenarios, we would suggest it's contrary to the letter and spirit of Rule 26. I wanted to mention a few other things and save some time for rebuttal. First, we were deprived of credits from the loss for various other operating expenses. For example, $6 million that federal insurance was required to pay was money advanced to subsidiaries FTM for their operating expenses. Over a million dollars was for the purchase of property, plant, and equipment. So that we were called upon, FTM buys property, plant, and equipment, gets to keep it, and we're called upon to reimburse them for it and pay interest on that reimbursement. Some of it was reduction of debt or a decrease in other liabilities. So they use the money to decrease their liabilities, and then we have to reimburse them for the decrease in their liabilities plus interest on that. That was plain error. There was no substantial basis on which a jury could not have or should not have given us credit for those expenses. You wanted to save five minutes. You're down to three and a half. I'm sorry, Your Honor? You have three and a half minutes. Okay. Thank you, Your Honor. I'll be brief. There are two other things I wanted to talk about, one of which was the Lloyds credit. Lloyds settled with Pacific Enterprises for $4 million. We were awarded the entire damage of 12 points, some odd million dollars. We believe we were entitled to a credit for that $4 million. Pacific Enterprises says a number of things. One, that there were other defendants. Yes, the other defendants settled specifically for $25,000. Two, that it was a rescission of the policy, but this was a policy that expired by its own terms in 1993. The rescission was in 1998. I think that was cosmetic only. I think the record will demonstrate that was cosmetic only. They suggested under California law we should have gone after Lloyds for some reimbursement, but I'm not exactly sure for what. The only person who got the double recovery was Pacific Enterprises. It was Pacific Enterprises against whom the offset should have been. What about a contribution action? How would I get a contribution? Lloyds paid $4 million. We paid 100% of Pacific Enterprises' loss. What would it be that Lloyds would contribute to? Lloyds had already paid what they'd agreed to pay. We had already paid 100%. It seems to me the only one who got the extra cash was Pacific Enterprises. What case authority are you relying upon to say that there should be an offset and the insurer that paid the other money is not a part of the action? Your Honor, there is a mix of authority on this point, but the James B. Lansing sound case, it's the Ninth Circuit decision in 1986, is our principal authority. That's different because there the parties stipulated to proration. I understand. I'm saying that we understand that the law goes both ways on this issue. What's the other way? The other way theoretically would be for us to sue Lloyds. No, you said the case authority goes both ways. There is some California authority that suggests that the remedy would be from contribution by us to the other carrier, but that only would apply where the other carrier has some obligation to contribute. The other carrier has already contributed. And therefore, since there's already been a settlement with the other carrier, it's not clear what that other carrier would contribute to. That's why I'm curious as to what legal authority you are urging that would compel the district court to rule in your favor. I don't think there's anything that would compel the ruling that you're asking. No, other than we think the standard concept that the plaintiff should not be enriched by the judgment, it should have a single recovery. And finally, Your Honor, it's the issue of interest. We understand that's a discretionary issue, but under these circumstances, we do not think that interest should have been awarded. We were compelled to pay interest on the Lloyds recovery. We were compelled to pay interest on all of those other expenses that we don't even believe should have been concluded or included in loss. I'd like to reserve my 25 seconds, please. Good afternoon, Your Honors. May it please the court, Kirk Passage for Pacific Enterprises. I would like to start with one of the points that Mr. Purvis ended with, which is the notion of an offset. Textron, which is a case we cited in our answering brief, which they ignored in the reply brief, which they ignore today, is dispositive. Textron's the 2004 California Court of Appeal case, very similar circumstances, says an insurance company is not entitled to an offset for a settlement with another insurer or with an insurance broker. That is what we did here. A settlement with a broker and an insurance company of a whole range of claims, including a sellback of the policy. Even if they had some argument for offset, which they do not, they didn't even try to show what amount should be offset. They assumed the totality of a settlement between multiple parties on multiple claims would be offset. It's not close. On the interest point, the judge is entitled under California law to exercise discretion. They made a big deal out of when the settlement discussions took place. That is only one of the multitude of factors, the primary factor being to compensate the plaintiff who recovers for the delay between the time of filing the complaint and the time of receiving judgment. And by the way, as the escrow court held, another factor the court can consider is that the contracted issue is an insurance policy. So there are a multitude of factors that Judge Collins, in her discretion, was permitted to consider. There's no abuse of discretion. Now, I am mystified, and I remain mystified by the notion that Mr. Freeman did something different at trial. Mr. Perlis asked him in cross-examination, verified that the numbers were the same numbers, that Martens, the work that he did on the declaration, and let's go back to the start here. This was a joint report prepared by Mr. Freeman and Mr. Martens. In a separate proceeding on summary judgment, we were given the opportunity to offer another declaration. We offered Mr. Martens. I would submit that if you look at the exhibit to that declaration, you will see, in essence, line by line, number by number, exactly what Mr. Freeman did. Why didn't Mr. Martens testify at trial? We had always intended, as we demonstrated in our answering brief, to call Mr. Freeman as our testifying witness at trial. Just as Federal did, we designated two experts. They worked together. Federal designated two experts who worked together. And, Your Honor, I think it's important to keep in mind that we're not the ones who asked for permission to substitute experts right before trial. It was Federal who made the attempt to substitute experts at the last minute. We had designated Mr. Freeman originally. He co-authored the expert report. He was deposed. When Judge Collins gave the opportunity to submit an additional declaration at a summary judgment hearing, we submitted one. Now, Mr. Freeman testified that it was his work. Those numbers were his numbers. Mr. Martens' second deposition was used by Mr. Perlis in an effort to impeach Mr. Freeman. But Mr. Freeman had been deposed. And he had been deposed on things like the basis for the original opinion, which was the first half of the subsequent Martens' declaration. Now, that Martens' declaration, and again, they did bring it up. And I think it's important to note that at one point in the testimony, Mr. Perlis did say to the judge, Your Honor, if these numbers differ, I may have to take it up with you. And she said, okay. She was willing to hear it. And it didn't happen. Now, the numbers, if you look at the Martens' supplemental declaration, and it's in volume four of the excerpt of record at tab 19. And there's one point in particular. It's ER 624. That is the chart, and it was used during the trial, that was submitted. And if you compare that chart with Mr. Freeman's butcher block chart, the math that's walked through is the same math. Mr. Freeman confirmed in trial that his opinion wasn't new. He was asked about it, and he confirmed it. And he walked them through. Now, it's true that in the original joint report, there was a big fat appendix attached to it. And that wasn't part of what Mr. Freeman used, although he was cross-examined on it. And it wasn't what Mr. Martens used either in the supplemental declaration, which was to address the concern expressed by the court. Now, the court's concern at the time, she was concerned about the operating expense issue. And that's how she defined direct loss. And I would ask the court to keep in mind that the underwriter's policy that Mr. Purvis referenced wasn't a policy that required direct loss. It simply referenced the broader but-for test that Judge Collins found wasn't applicable to the federal policy because of the report. Yes. You were saying the butcher block presentation was essentially the same as in the big reports. Didn't it have a new gross profit number in there? I think it's important. Yes, it did, because I asked Mr. Freeman to do something. I said, first of all, what's your opinion? And he used the 30% gross profit figure, and he testified as the foundation for that figure. It was his experience over the years as an accountant. It was in the audit report, and Ms. Bocek herself endorsed it in the testimony that was offered of her through deposition. So there were three sources for that. Now, he acknowledged, because I asked him to, the criticism that federal had raised. And he did the math that I could have done. But that was a different. That wasn't his opinion, though. That was a different theory, though. No, Your Honor, with all due respect, because I asked him in direct examination near the end, now you've used 9.66%, and you could use 8.6% and do that math as well. And you could do 0% and do that math as well. And he said, yes, yes, yes. And I said, but what is your opinion? Is it 9.66% or is it 30%? And he said, Mr. Passage, my opinion is the 30%. That's the $31 million number. What was the point, then, of doing the 9.66% exercise? Because, one, it's the most accurate number. Mr. Fox verified it. I frankly didn't need Mr. Freeman to do it. I could have asked Mr. Fox to do it. He verified the number as the most accurate number. But second, the decisions out there say that I can have an expert do additional calculations in response to rulings or things that have happened in the case. Not a different theory, not a different methodology, but I could have asked him, what if you assumed 50%, which had nothing to do with anything? May I ask a follow-up? I thought I heard Mr. Perlis say, because I asked him this question, I said, did Mr. Freeman just change the percentage of profit or did he change X? Did he change the other variable, the variable to which the profit margin was applied? And I thought his answer was he changed X, that in his trial opinion, he used a different methodology to determine the number to which the profit percentages were then applied. And I'd like to hear your response to that. I don't think it's right. He said that Mr. Freeman sort of started at one and worked backwards. That's why I said, if you look at the handwritten butcher block and you compare it with the exhibit, which is page 25 on the Martens Declaration, the Supplemental Declaration, and compare them, they start at the exact same place. For X stays the same in all of the Martens opinions and in the Freeman opinion. And the only thing that changes is the profit margin. Well, the profit, again, that was not Mr. Freeman's opinion. He was careful to say that he stood by 30% and thought it was the right number. But if you. What was the number of the X that this profit margin was applied to? What was that number? Your Honor, Mr. Freeman explained that and it's a series of calculations. I'm not an accountant. I can't do it justice, but I did have him explain it in his testimony. I'm not asking for the method. I'm just asking what was that starting number? He took, well, he took the number, which was a normal profit, gross profit margin. He took sales and he took expenses. And he said, normally in a business, when you have a certain revenue generation, you have a certain profit return on whatever your business without having, as he put it, 30%. That sounds like a theory as opposed to a calculation. If you've got to walk us through it on a calculation, you take one number, multiply it by a different number, subtract a next number and come to a result. But if you have to have all of this explanation for it, it sounds like a theory as opposed to a calculation. Everyone did the math the same way, Your Honor, on this point. It just depends on what the numbers are. That's what we're asking for. What was the number that the gross profit margin was applied in the Martins Declaration as opposed to the Butcher Block calculation? That's not where there's a difference, Your Honor. That's what I'm saying. If you look at the Martins Declaration and you look at those numbers, they're the same. There's not a difference. Where are we on the excerpt of record for the Supplemental Martins Declaration? The Supplemental Martins Declaration, the excerpt of record cited to the specific page with the chart, is ER 000624, and that is found in Volume 4 at Tab 19. And that's what I'm saying, is if you go to that chart and you compare it to what Mr. Freeman hand wrote up. Where's that handwritten one in the excerpt? It is in Volume 3 of the Supplemental Excerpt of Record. It's SER 838, Tab 35. Okay. And if you work through those numbers, you can actually see that while Mr. Freeman used some shorthand abbreviations for things like Outstanding Letter of Credit, which he did as OS, you can see that it's listed right there as Outstanding Fraudulent Letters of Credit. For example, Mr. Martins is $19,021,302. Mr. Freeman is $19,021,302. They start with the exact same $42 million number. They do the same math additions and subtractions down to the end, and they come up with the number. Now, there were the issues of operating expenses and inventory. And by the way, operating expenses has been the term used in this case from inception. I know that Mr. Perlis now wants to complain about it. He made reference to it in the reply brief, talked about being surprised and hoodwinked by what we did. What we did was what was in, if you go back to the genesis of the case, in the September 11, 1991 Special Audit Committee report, it was in what Federal's own claims adjuster used as his terminology. It was the judge's definition of direct loss that they endorsed and cited affirmatively. The definition of operating expense has been in this case from the start, and it's been what the issue has been. Mr. Perlis now would like some other things to be shoved into that category of operating expense, but the only testimony at trial was the things he's talking about that don't fit in operating expenses are not operating expenses. Now, on this question of gross profit and the question of inventory, Mr. Freeman, who was the only fraud examiner to testify in this case, he talked about things about what appropriate standards you would have to do if you're looking at a business's books. If you're doing a certified fraud examination, which looks and talks and smells a lot like an audit. And on the inventory, his point was very simple. He couldn't verify the presence of a single dollar of inventory at the operative date of March 31. That was his point. Mr. Fox assumed that the inventory on November was still there at the end, although he never inspected it. We, in fact, know from Mrs. Bocek's testimony that there were circumstances where people opened warehouse doors and found empty warehouses instead of inventory. All Mr. Freeman did, and he was candid, he said he didn't know what the inventory was, whether it was zero or 11 or 14 million. What he did know is when you're doing an examination and you're examining books of a company and you're looking to come up with verified numbers, you can't put in what you couldn't verify. Mr. Fox did the opposite. Mr. Fox made assumptions without verification. Mr. Freeman had an explanation for the 30 percent. His experience, the special audit committee report that Mr. Fox himself endorsed, and Marie Bocek. All he did, although we offered that exact same opinion at trial, was come back at the end and said, if you made some mathematical adjustments, these were different percentages. He didn't endorse them. Obviously, the jury accepted them. And the jury accepted the adjustment that was made on inventory. They used Mr. Freeman's date and Mr. Fox's inventory amount. Mr. Fox testified to a precise dollar amount as to what the 11 million was in inventory. And that's the adjustment the jury made. They made an inventory adjustment. They made a adjustment on the profit margin. So those are the two things they complained about. They took Mr. Fox's profit margin? They took the more accurate, which Mr. Fox acknowledged was the most accurate number. No one disputed that 9.66 percent was the most accurate number in terms of actual profit margin. Mr. Freeman's point was that number shouldn't be used because but for the fraud, that wouldn't have been the number. So in essence, it gave the benefit to the insurance company of Mr. Miller's fraudulent acts to generate a profit margin that wouldn't have happened. And by the way, one tone or tenor to this entire discussion is what caused all of this and what we're what we're here about. Mr. Freeman referred to it as a house of cards. Ms. Bocek testified that she saw nothing legitimate about the operating expenses because they were all done fraudulently. Now, this record, when we look at these numbers and we work through it, the numbers that Mr. Freeman used, and if you're going to use a gatekeeper function with an expert. One of the questions, almost every case involved, is where the expert comes up with numbers that come out of nowhere. Mr. Freeman testified where every one of his numbers came from. There was no dispute, for example, that when he started, he started with the reported and verified balance in the intercompany account. That was the $42 million number. And he explained number by number where he got them, that they came out of the audit report, which is the one Mr. Fox found reliable. And there were only two numbers that were debatable and only two. One was the profit margin number, which Mr. Freeman explained, and the other was the inventory. Can you can you comment on this colloquy we had earlier that the original Daubert opinion by Judge Collins in the first go around was based on only the profit margin? And there's her finding of unreliability was based solely on the profit margin analysis because counsel took issue with that. I don't think I know that Mr. Perlis said it also had to do with some other expenses that we thought should be included, which is why I went back and looked at it, because I didn't remember that being in the opinion. And having looked at it briefly, I still don't remember it being in the opinion. She did mention the profit margin. But the primary difference here is when it came back down, what she said and whatever else we can say happened here. This is a judge who at the end of the day basically reversed several years and multiple hearings of her thought as to whether or not there was evidence and what she said at the end of the day. So, I mean, we're talking about a judge who considered this thoroughly extensive, multiple briefing, multiple oral arguments, a chance that Mr. Perlis's invitation in the middle of trial to revisit the issue again. And what she said is Mr. Martins did what I asked him to do. Now, you said he tried. He tried. He tried to back up. Now, did he did she think that he had necessarily done everything that would be necessary? She thought, I believe, from the opinion, from the transcript of the argument and from how she approached trial, that he tried to back out legitimate operating expenses. And the two issues that were lingering there, the inventory one not being a big one on summary judgment. The big issue was the 30 percent profit margin, which was supported by Mr. She said that was primarily her reason, but she said there were a fair number of other reasons and problems she had with his. I think it's clear, Your Honor, that certainly at the summary judgment hearing, she had a lot of problems with it. I think she'd resolve some of those problems. And I think at the end of the day, in the exercise of her discretion, she concluded that the problems that she thought that remained were not gatekeeper problems. They were problems that should be tested. But she didn't articulate that. That's the difficulty I'm having with the ruling, is that she changed her mind without saying why. No, I think she did say why, Your Honor, because she talked about they should be tested through cross-examination. And I think what she concluded was that was the appropriate way to resolve these issues. And they were tested. That didn't negate the fact that she said previously that they were so unreliable, they shouldn't even go to a jury. So you have conflicting. Well, Your Honor, the prior ruling was the one that was reversed by this court. That part of it was not reversed. Even the district court judge said that the circuit court did not address the ruling on the experts. I agree with that, Your Honor. The ruling on as far as the expert was and what the judge was dealing with on summary judgment was the totality of the evidence before her. What the Ninth Circuit said was there were other things and that we didn't have to trace. And there was a big debate, obviously, below about whether we had to trace or not. And so I think the question that came back, by the way, if at the end of the day, I certainly think it was within the Ninth Circuit's province to say at that time, the only thing out here is this complete inadmissible expert report. But we generally don't opine on matters that were not brought, especially on appeal. And you can infer by silence that the court had no problem. Well, we did raise the issue on appeal, though, Your Honor, because we said her ruling was just flat out wrong. In all particulars, we challenged the, we said that what Freeman and Martins had done was sufficient. And we also talked about, frankly, the focal point of the appeal wasn't the judicially noticeable information. We certainly stressed that there were judgments out there and findings out there. The fact of the matter is that that issue was not addressed. It was not addressed by the panel. I would agree. The panel itself did not comment one way or the other on whether or not the supplemental report satisfied Dauber. They just said there was some loss. So it was there in a grand summary judgment. Yes, they found that there was a material issue. I'm not even sure that, I think what they did was said, to be fair to the panel, that we had shown that there were at least issues of material fact as to whether there was a loss above $500,000. Right, right, right. And so that was the issue. And when it came back down and we went through a whole series of processes with Judge Collins, it was motions and liminee. There was an attack on a graphic, for example, that we offered that dealt with inventory only. We were told we could not afford that. That is a separate theory. I mean, she went through everything. And at the end of the day, I think the question has to be, are we bound by and limited by her decision as to a declaration on summary judgment as opposed to our expert testimony at trial? I think she was permitted to say, I'm going to listen to the expert testimony. Mr. Purvis at one point suggested it be taken subject to a motion to strike, which was clearly within her province to do. It wasn't stricken. And so she had the opportunity to consider it again and again after the Ninth Circuit ruling, multiple times before trial started, in the middle of trial at Mr. Purvis's request, at the end of trial. Yeah, but the problem I have is it may be an abuse of discretion to just reverse yourself with no clear articulation of the law or the rationale for doing that. Your Honor, I don't think she reversed herself. What she did on the first hand was address a motion for summary judgment. And the Ninth Circuit reversed her order on that. When it came back for the time of trial, she looked at Martens. There was supplemental declaration submitted at Martens in connection with the pre-trial briefing. There was another Martens declaration submitted, and the motion's eliminated, a much shorter one. But there was yet one more declaration that was before her in terms of Martens. So we have the opportunity to offer some other explanations and some other things before trial, which she looked at. Yeah, but she never said that it was under Daubert, it was adequate. She never made a Daubert – a second Daubert ruling. I think she did, Your Honor, by saying we could proceed and they should testify cross-examination. I understand your argument. All right. Thank you, Your Honors. I have two minutes, Your Honor. Yes. First, when Mr. Freeman testified, I did object. I first asked for a sidebar. Judge Collins refused it. I then objected. Judge Collins did neither sustain nor overrule the objection. Well, what about the representation by counsel that there was an offer that the testimony coming in subject to a motion to strike, and then that motion was never made? We tried to object to it on the grounds that it was improper testimony. Judge Collins would not hear me at the sidebar and would not rule on my objection. We then addressed it in a motion for new trial afterward. That's what we chose to do. The 30 percent issue where he said Bochek and everybody else had sufficient basis for it, Judge Collins, in her opinion, on page 24 on the motion for summary judgment, acknowledges that Mark Henn's deposition, he acknowledged that Bochek never even referred to the 30 percent figure as an industry standard. With respect to the 9.66 percent, counsel acknowledges that – He gave you what his figures would work out at 9.6. Your expert says 9.6 is fine. The jury apparently used 9.6. The issue is if I'm presented with a series of figures, some higher, some lower, it could influence the jury and may well influence the jury to say, well, you know, they've got this higher number, but I'm going to give them a lower number. They used the number your expert said was correct. The 9.66 in and of itself was the most accurate number, but had never been – So what's the harm of the 30 percent? The harm is twofold, Your Honor, as with the 9.66. As to the 30, it is if you present a range of numbers to the jury, as counsel did in closing argument, you know, starting from the top and working your way down to the extent you can throw out some straw men toward the top, it makes the jury, to the extent they want to do something for you, more inclined to give you a number. To the extent there was only a single number presented, who knows what the jury would have done. Mr. Freeman, he said, I didn't know whether there was inventory or no inventory, so I couldn't make an assumption. Of course he made an assumption. He assumed there was no inventory. But again, they did treat the inventory the way they should have. No, they didn't. But they gave us an inventory number, and frankly, I don't know that I could get any kind of substantial evidence overturned on their choice between 14 and 11. But they did pick 11. But Mr. Freeman, in terms of being able to give expert testimony, misled the jury to say, I couldn't assume one way or another. In fact, he assumed no. Finally, Your Honor, with regard to the issue of the offset, Federal's insurance policy in Section 4.7 has a recovery provision. And it says, to the extent Pacific Enterprises recovers any other money with respect to this claim, we're entitled to it back less $500,000. So that, apart from whatever case law there may be, there's an express contractual provision that entitles us to that money. I think, Your Honor, I've imposed upon you and your generosity too long, and I thank you for your courtesy. Thank you for your argument. Thank you both. The case is arguably submitted.
judges: Reinhardt, Rawlinson, Fogel